

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3885 | **DATE** | 3/26/2001 |
| **CASE TITLE** | Trans Union LLC vs. Credit Research, Inc. et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for preliminary injunction is granted in part and denied in part. Status hearing set for April 11, 2001 at 9:45am.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail A 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |

MAR 2 7 2001

00-7
FILED FOR DOCKETING
01 MAR 26 PM 3:56

| WAH | courtroom deputy's initials | date mailed notice |
|---|---|---|
| | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number 45

| | | |
|---|---|---|
| TRANS UNION LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 00 C 3885 |
| | ) | |
| CREDIT RESEARCH, INC., and | ) | |
| CREDIT BUREAU OF CARMEL AND | ) | |
| PEBBLE BEACH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

MAR 2 7 2001

## MEMORANDUM OPINION AND ORDER

In this trademark dispute plaintiff Trans Union LLC ("Trans Union") accuses defendants Credit Research, Inc. ("CRI") and Credit Bureau of Carmel and Pebble Beach, Inc. ("Credit Bureau") (collectively "defendants") of misusing Trans Union's trademarks on the internet. Trans Union alleges that defendants are displaying the Trans Union logo on their internet web pages and using the Trans Union trade name in their website's domain names and metatags in violations of federal and state trademark protection laws. Trans Union has now filed a motion for preliminary injunction targeted at defendants' website. For the reasons set forth below, Trans Union's motion is granted in part and denied in part.

## BACKGROUND

Trans Union is in the credit reporting business. It collects consumer credit information from across the country, maintains that information on a national database known as CRONUS, and sells the information in credit reports and other products. Trans Union controls 35 per cent of the industry, making it one of the three major credit reporting agencies in the country. Its two chief competitors are Experian Information Solutions, Inc. (Experian)

and Equifax, Inc. (Equifax). In connection with its business, Trans Union owns the federally-registered trade name "Trans Union" (trade name) and stylized "TU" logo (logo) (collectively "trademarks" or "marks").

In 1986, Trans Union's predecessor entered into a service agreement with CRI, a local credit bureau serving Santa Cruz, San Benito, and Monterey counties of northern California. (Cplt. Exh. 1). CRI subsequently assigned its rights and obligations under the service agreement to Credit Bureau.[1] Under the terms of the contract Credit Bureau supplies Trans Union with credit information from its three-county region in exchange for the ability to access the nationwide credit data stored on Trans Union's CRONUS network. This arrangement has been beneficial to both parties. Trans Union has been able to rely on Credit Bureau to gather local credit information from its province of the country. Indeed, Trans Union has entered into similar contracts with a number of other local credit bureaus and thereby has been able to assemble a nationwide body of credit information. As for Credit Bureau, it has been able to sell credit reports derived from Trans Union's CRONUS database to its local customers. Credit Bureau also has used Trans Union to provide billing and other services related to its credit bureau business.

Although the service agreement creates a contractual relationship between the parties, it is silent on the issue of intellectual property rights. Not surprisingly, therefore, issues regarding defendants' usage of Trans Union's trademarks have arisen over the years. Soon after entering into the service agreement Trans Union attempted to clarify some of the confusion. In a 1987 letter, Trans Union instructed Credit Bureau that it should "not imply

---

[1] The service agreement is set to expire on July 1, 2001 (counterclaim at ¶ 15).

in business stationery any form of ownership by Trans Union," but, instead, should "use wording such as 'affiliated with Trans Union' or 'serviced by Trans Union'" to describe the business relationship (Cplt. Exh. 2). Trans Union addressed the issue again several years later. In a 1996 letter to all affiliated local bureaus, Trans Union admonished that "in order to avoid a legal misrepresentation of the relationship ... and ... dilution of the Trans Union trademark, CRONUS Bureaus need to be careful about the manner in which they use the Trans Union name." Trans Union then went on to provide some guidelines regarding how local bureaus could and could not use the Trans Union trade name. Specifically, Trans Union identified certain correct designations (*e.g.*, "Automated with Trans Union," "Serviced by Trans Union," "A member of the Trans Union Automated network," and "Serving the Trans Union system in [city or state]") and also cited a number of incorrect designations (*e.g.*, "XYZ Credit Bureau/Trans Union," "A Franchise of Trans Union," "Trans Union's [city] Bureau," "[city/state]'s Trans Union bureau," and "A division of Trans Union") (Cplt. Exh. 3).

Despite these letters, Credit Bureau continued to use a letterhead that Trans Union found objectionable. In a letter dated March 11, 1998, Trans Union notified Credit Bureau that it was in violation of Trans Union's trademark rights and demanded that Credit Bureau cease and desist its unlawful conduct (Cplt. Exh. 4). The parties subsequently discussed the matter over the telephone and on April 7, 1998, Trans Union sent a letter to Credit Bureau stating that Trans Union does not permit the local "bureau to make any use of its 'TU' logo" and that the only permitted use of the Trans Union trade name "is that which accurately describes the relationship between" the parties, such as "A Credit Bureau Serviced by Trans Union Corporation," or "A Member Of The Trans Union Corporation Automated Network" (Cplt. Exh. 5). On April 17, 1998, Credit Bureau wrote back to inform Trans Union that it was

changing its letterhead to conform with Trans Union's request (Cplt. Exh. 6).

Foreshadowed by the letterhead dispute, the controversy regarding defendants' use of Trans Union's trademarks has now emerged in cyberspace. The focus of the conflict is defendants' use of the marks on their internet website.[2] Defendants market a variety of different credit products on their website. They sell credit reports derived from information maintained on Trans Union's CRONUS database, and also market credit reports from Experian and Equifax, as well as merged reports containing information from more than one source. Defendants no doubt view their website as a successful expansion of their marketing efforts. Trans Union, however, believes that defendants have again crossed the line to tread on its intellectual property rights. Specifically, Trans Union claims that defendants' website abuses its trademarks in three ways. First, Trans Union claims that defendants unlawfully display the Trans Union logo on their web pages. Second, Trans Union criticizes defendants for registering their website under domain names[3] which contain the Trans Union trade name, including transunioncredit.com, transunioncredit.org, transunioncredit.net, creditbureautransunion.com, creditbureautransunion.org, and creditbureautransunion.net. Third, Trans Union alleges that defendants illegally use the Trans Union trade name in their

---

[2]Defendants' website can be found at www.creditbureau.org. Trans Union also operates a website, located at www.transunion.com.

[3]A domain name "identifies a place on the Internet where a 'home page' or 'web site' can be located." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 25:71, 25:72 (4th ed. 2000). "A website's domain name signifies its source of origin, and is therefore an important signal to internet users who are seeking to locate web resources." Patmont Motor Werks, Inc. v. Gateway Marine, Inc., 1997 WL 811770, at *4 n.6 (N.D. Cal. Dec. 18, 1997); *see also* Intermatic Inc. v. Toeppen, 947 F.Supp. 1227, 1230-32 (N.D. Ill. 1996).

website's metatags.[4]

On April 6, 2000, Trans Union sent defendants a cease-and-desist letter regarding their use of the trademarks on the internet (Cplt. Exh. 8). The parties were unable to reach an amicable resolution of their differences and, on June 27, 2000, Trans Union initiated this lawsuit. The eight-count complaint raises federal claims of trademark infringement (count I) and unfair competition (count II) under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), trademark dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)(1) (count VII), and cyberpiracy under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1) (count VIII). Trans Union also alleges violations of the Illinois Uniform Deceptive Trade Practice Act, 815 ILCS 510/1 *et seq.* (count IV), Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (count V), and common law claims of trademark infringement and unfair competition (count III) and unjust enrichment (count VI). On November 21, 2000, Trans Union filed a motion for preliminary injunctive relief. Trans Union's motion essentially urges us to enjoin defendants from the following: 1) displaying the Trans Union logo on their web pages; 2) using the Trans Union trade name as part of their registered domain names; and 3) embedding the Trans Union trade name in their website's metatags.

## DISCUSSION

### I. Preliminary Injunction Standard

In order to obtain a preliminary injunction the moving party must establish that 1) there

---

[4]Metatags are embedded code that help internet search engines identify the content of a website. *See* Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1061-62 n.23 (9th Cir. 1999) (explaining technology and function of metatags); Playboy Enterprises, Inc. v. Welles, 7 F.Supp.2d 1098, 1104 (S.D. Cal. 1998) ("Much like the subject index of a card catalog, the meta tags give the websurfer using a search engine a clearer indication of the content of the website."), *aff'd*, 162 F.3d 1169 (9th Cir. 1998).

is a reasonable likelihood of success on the merits; 2) there exists no adequate remedy at law; 3) it will suffer irreparable harm without the injunction; 4) the threatened harm to the movant outweighs the injury an injunction may cause to the nonmovant; and 5) the injunction will not disserve the public interest. *See* <u>Kiel v. City of Kenosha</u>, 236 F.3d 814, 815-16 (7th Cir. 2000). We are to assess these factors on a sliding scale. The greater the movant's likelihood of succeeding on the merits, the less the balance of harms need be in his favor. *See* <u>Eli Lilly & Co. v. Natural Answers, Inc.</u>, 233 F.3d 456, 461 (7th Cir. 2000).

We turn our attention first to Trans Union's likelihood of succeeding on the merits of its various claims. The Seventh Circuit has defined this initial element of the preliminary injunction analysis as requiring the movant to demonstrate a "better than negligible" chance of success on the merits. <u>International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.</u>, 846 F.2d 1079, 1084 (7th Cir. 1988). After assessing the merits of Trans Union's claims, we will go on to consider the other relevant elements of the test in order to determine whether the circumstances support a preliminary injunction in this case.

## II. Trademark Infringement and Related Claims

Count I of the complaint alleges trademark infringement under the Lanham Act, 15 U.S.C. § 1114. In order to succeed on such a federal trademark infringement claim, Trans Union must establish that it has a protectable trademark and that defendants' misuse of the trademark creates a likelihood of confusion among consumers. <u>Barbecue Marx, Inc. v. 551 Ogden, Inc.</u>, 235 F.3d 1041, 1043 (7th Cir. 2000). This same analysis applies to Trans Union's unfair competition claim under the Lanham Act, *see* <u>Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.</u>, 128 F.3d 1111, 1115 (7th Cir. 1997), its unfair trade practice claims under the Illinois Uniform Deceptive Trade Practice Act and Illinois Consumer Fraud and Deceptive

Business Practices Act, *see* D 56, Inc. v. Berry's Inc., 955 F.Supp. 908, 920 (N.D. Ill. 1997), and

its trademark infringement and unfair competition claims under Illinois common law, *see* AHP

Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 619 (7th Cir. 1993). Therefore, with

respect to the likelihood of success on the merits, counts II-V share the same fate as count I.[5]

Trans Union argues that the display of Trans Union's logo on defendants' web pages

and use of Trans Union's trade name in defendants' domain names and metatags are likely

to create the false impression that Trans Union endorses or otherwise is affiliated with

defendants' website. *See* PACCAR, Inc. v. Telescan Technologies, L.L.C., 115 F.Supp.2d 772,

780 (E.D. Mich. 2000) (discussing similar website-related infringement claim). Defendants

disagree. Their defense rests in part on the affiliation between the parties, and also raises

questions with regard to the protectability of Trans Union's marks and the likelihood that

defendants' website results in customer confusion.

A. Affiliation Between the Parties

Trans Union and defendants have been linked under the service agreement since 1986.

As described above, the service agreement provides that defendants are to supply Trans Union

with local credit information in exchange for the ability to access the nationwide credit data

stored on Trans Union's CRONUS network. Seizing on this affiliation, defendants argue that

their use of the Trans Union trademarks is consistent with the parties' contractual

relationship.

Initially, we observe that the service agreement itself does not confer any intellectual

property rights (Cplt. Exh. 1). Defendants concede this fact but contend that their right to use

---

[5]The merits of the federal trademark dilution claim (count VII) is discussed in part III below. Trans Union does not raise unjust enrichment (count VI) or the Anticybersquatting Consumer Protection Act (count VIII) in support of its motion for preliminary injunction.

the Trans Union marks is an essential part of the contractual relationship. Defendants explain that they are entitled to use the Trans Union marks on their website because they sell credit reports derived from Trans Union's CRONUS database. Defendants compare themselves to resellers and authorized dealers in this regard. *See* Quill Corp. v. NADA Scientific Ltd., 1998 WL 295502, at *2 (N.D. Ill. May 21, 1998) (explaining "first sale" doctrine which allows resellers of genuine, unchanged products to use manufacturer's trademarks); *see also* Berina of America, Inc. v. Fashion Fabrics International, Inc., 2001 WL 128164, at *2-3 (N.D. Ill. Feb. 9, 2001) (applying the "first sale" doctrine in the internet context); PACCAR, 115 F.Supp.2d at 780 n.8 (same). But defendants are not like resellers or authorized dealers, as they do not merely purchase credit reports from Trans Union and then turn around and sell these products unaltered on the internet. Although defendants sell credit reports on their website that are derived from information maintained on the CRONUS database, those reports include credit information owned by defendants as well as credit information owned by Trans Union and other affiliated local credit bureaus (Counterclaim at ¶¶ 21-30). This sets defendants apart from resellers of Trans Union credit reports.[6] Furthermore, unlike independent resellers, defendants have a contractual relationship with Trans Union, and Trans Union has limited the use of its trademarks as part of that relationship (Cplt. Exhs. 2-5).

Although the affiliation between the parties does not entirely trump Trans Union's trademark rights, it does raise the question whether defendants have engaged in fair use of the marks. "The fair use doctrine is based on the principle that no one should be able to

---

[6]Defendants point out that their relationship with Trans Union is more symbiotic than that of resellers. This may be true, but it has no impact on the trademark issue. A reseller's right to use a manufacturer's trademarks stems not from the closeness of its relationship with the manufacturer but from its sale of genuine, unaltered products. *See generally* Sebastian International, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1074-76 (9th Cir.), *cert. denied*, 516 U.S. 914 (1995).

appropriate descriptive language through trademark registration." <u>Sands, Taylor & Wood Co. v. Quaker Oats Co.</u>, 978 F.2d 947, 951 (7th Cir. 1992). "To prevail on the fair use defense, the defendant must establish that its use of a registered 'term or device' is 'otherwise than as a trade or service mark,' that the term or device is 'descriptive of' the defendant's goods or services and that the defendant is using the term or device 'fairly and in good faith only to describe to users' those goods and services." *Id.* (*quoting* 15 U.S.C. § 1115(b)(4)). It is well settled that the "fair use doctrine applies in cyberspace as it does in the real world." <u>Brookfield Communications, Inc. v. West Coast Entertainment Corp.</u>, 174 F.3d 1036, 1065 (9th Cir. 1999).

Several courts have held that the fair use doctrine applies when a defendant uses another's trademark simply to describe the content of defendant's website. *See* <u>Brookfield</u>, 174 F.3d at 1065-66; <u>Bihari v. Gross</u>, 119 F.Supp.2d 309, 321-24 (S.D.N.Y. 2000); <u>Playboy Enterprises, Inc. v. Welles</u>, 7 F.Supp.2d 1098, 1103-04 (S.D. Cal. 1998); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:69 (4th ed. 2000). Defendants' use of the Trans Union trade name in their website's metatags falls within this line of authority.[7] As explained in footnote 4, metatags are embedded code that signal the contents of a website to internet search engines. A single website typically contains a number of metatags. Defendants' transunioncredit.com website, for example, is embedded with at least 17 metatags that describe the content of the website. The website's metatags contain the terms

---

[7] The fair use defense may also apply to defendants' www.creditbureautransunion.com domain name, as the use of Trans Union's mark in that domain name permits of an adjectival reading (*i.e.*, that Credit Bureau sells information derived from Trans Union's database). <u>TCPIP Holding Co., Inc. v. Haar Communications, Inc.</u>, 2001 WL 197939, at *14-15 (2d Cir. Feb. 28. 2001) (discussing fair use doctrine in the context of domain names). As we discuss below, however, the domain name does not create a likelihood of confusion and thus we need not further examine its descriptive nature in the context of the fair use doctrine.

"credit," "credit report," and "residential mortgage credit report," as well as "trans union," "equifax" and "experian" (Rakov aff. at ¶ 14).[8] There is nothing inaccurate about including Trans Union's trade name in a metatag, since the metatag simply describes defendants and the content of their website (*i.e.*, that defendants are affiliated with Trans Union and that their website offers products derived from Trans Union's database). *See* Brookfield, 174 F.3d at 1065-66 (holding that defendant "can legitimately use an appropriate descriptive term in its metatags" under the fair use doctrine); Bihari, 119 F.Supp.2d at 321-23 (same); Welles, 7 F.Supp.2d at 1104 (same). Therefore, defendants' use of the term "trans union" in a website metatag constitutes fair use of the trade name.

B. Protectable Trademarks

Setting aside defendants' fair use of the Trans Union trade name in their website's metatags, we are left with defendants' display of the logo on their web pages and use of the trade name in their domain names. Before examining the confusing nature of these uses, we must determine whether Trans Union's trademarks are protectable in the first place. Trans Union registered its trade name and logo with the U.S. Patent and Trademark Office in the early 1970s (Federal Trademark Reg. Nos. 917,889 and 933,250). The trademarks have been in continuous use since then and consequently have become incontestable pursuant to 15 U.S.C. § 1065. As such, Trans Union's marks are presumptively valid and protectable. *See* 15 U.S.C. §§ 1115(a), 1057(b); Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 301 (7th

---

[8]Significantly, only one "trans union" metatag is embedded in the website, indicating that defendants have not engaged in "cyber-stuffing," the practice of repeating a term numerous times in a website's metatags in order to lure the attention of internet search engines. *See McCarthy on Trademarks* § 25:69. The evidence also indicates that the use of this single metatag does not misdirect users to defendants' website. Defendants point out that searches for the term "trans union" conducted on three popular internet search engines, AltaVista, Excite, and Lycos, resulted in a list containing hundreds of websites but that defendants' website was not among the top fifty sites listed (Rakov aff. at ¶¶ 10, 15).

Cir.), *cert. denied*, 525 U.S. 929 (1998).

Defendants try to rebut the presumptive validity of the marks on three related fronts: abandonment, *laches*, and acquiescence. *See* 15 U.S.C. §§ 1115(b)(2), (b)(8). First, defendants assert that Trans Union has abandoned its trademarks. It has not. Abandonment requires intentional non-use of a trademark and results in relinquishment of the trademark rights against the world. *See* 15 U.S.C. § 1127. There is nothing in the record to indicate abandonment here. *See* Rust Environment & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1214 (7th Cir. 1997); TMT North America, Inc. v. Magic Touch Gmbh, 124 F.3d 876, 885 (7th Cir. 1997). Second, defendants raise a *laches* argument. Again, they fail to persuade. The record does not indicate when defendants first began operating their website, but we can infer that it was fairly recently and probably sometime after 1998. Trans Union dispatched a cease-and-desist letter regarding defendants' website on April 6, 2000 (Cplt. Exh. 8). Trans Union's timely objection to defendants' conduct leaves no room for a *laches* defense in this case. *See* Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 933 (7th Cir. 1984) ("two years has rarely, if ever, been held to be a delay of sufficient length to establish *laches*" in a trademark case).

Defendants' third argument, acquiescence, carries more merit than the other two. Acquiescence arises as a defense to trademark infringement in "cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another." TMT North America, 124 F.3d at 885 (quotation omitted). Acquiescence merges with *laches* when it is based on silence. Piper Aircraft, 741 F.2d at 933. Defendants' acquiescence argument, however, rests not on silence but rather on Trans Union's conduct during the course of its contractual affiliation with defendants. Defendants argue that Trans Union has given them

permission to use its trademarks over the fourteen-year history of their relationship. This is only partly true. Trans Union's practice has been to permit affiliated local bureaus to use only certain designations of its trade name and to forbid any usage of its logo.[9] The letters of 1987, 1996 and 1998 flesh out the scope of this understanding (Cplt. Exhs. 2-5). Trans Union's motion for preliminary injunction acknowledges this limited acquiescence in that Trans Union does not seek to enjoin the sort of use authorized in its correspondence with defendants. Thus, although Trans Union has consented to certain uses of its trademarks, defendants' acquiescence argument does not get them very far because the preliminary injunction motion is directed at different types of conduct.

C. Likelihood of Confusion

Having determined that Trans Union has protectable trademark rights at stake, we next examine whether defendants' display of the logo on their web pages and use of the trade name in their domain names creates a likelihood of confusion among consumers. In examining the likelihood of confusion question, courts in this circuit generally consider seven factors: "(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the complainant's mark, (6) any evidence of actual confusion, and (7) the defendant's intent (or lack thereof) to palm off its products as that of another." Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 461-62 (7th Cir. 2000) . The weight given to each of these factors differs from case to case. Id. at 462.

---

[9]Defendants also point to the fact that Trans Union placed its logo on invoices it prepared for defendants' customers, listed defendants as a servicing party on its credit reports, and provided standardized brochures to defendants (Def. Br. at 4, 7). Trans Union's use of its own marks, however, does not prove that it acquiesced to defendants' use of the trademarks.

"At the same time, although no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations." *Id.*

1. Similarity of the Marks

Defendants display the Trans Union logo on their internet website and do not dispute that it is identical to Trans Union's registered stylized logo. Therefore, the similarity factor is met with respect to the logo. When we compare defendants' registered domain names to the Trans Union trade name, however, we find some differences. Trans Union cites six allegedly infringing domain names.[10] Initially, we can peel off the "www" prefix and ".com," ".net," and ".org" suffixes from the domain names as they are not important to the likelihood of confusion analysis. *See* TCPIP Holding Co., Inc. v. Haar Communications Inc., 2001 WL 197939, at *12 (2nd Cir. Feb. 28, 2001); Brookfield, 174 F.3d at 1055. Thus, we actually face only two problematic domain names: transunioncredit and creditbureautransunion. The first domain name at issue simply takes the Trans Union trade name and adds on the word "credit." *See* TCPIP, 2001 WL 197939, at *12 (capitalization and spacing are irrelevant when comparing trade names to allegedly infringing domain names). Trans Union and defendants are in the credit reporting business and therefore the added word takes on little distinctive significance when used in this manner. Thus, transunioncredit does not represent much of a departure from the trade name itself. *See* PACCAR, 115 F.Supp.2d at 777 (finding truck locator service's domain names "peterbilttrucks," "peterbiltnewtrucks," and "kenworthusedtrucks" were infringingly similar to truck manufacturer's trademarks "Peterbilt" and "Kenworth"); Ford Motor Co. v. Ford Financial Solutions, Inc., 103 F.Supp.2d 1126, 1128-29 (N.D. Iowa

---

[10]They are: www.transunioncredit.com, www.transunioncredit.org, www.transunioncredit.net, www.creditbureautransunion.com, www.creditbureautransunion.org, and www.creditbureautransunion.net.

2000) (finding financial company's domain name "fordfinancialsolutions" infringingly similar to plaintiff's "Ford Financial" trademark).

The second domain name at issue, creditbureautransunion, is less similar to Trans Union's trade name. "[A]s the differences separating the [defendants' domain] names from the plaintiff's mark become more noticeable, the similarities are likely to appear to consumers as more reflective of the fact that both are being used to designate something having to do with [the same business] rather than indicating a common source." TCPIP, 2001 WL 197939, at *12. The addition of the term "credit bureau," especially in the first position, makes this domain name less susceptible to consumer confusion. Also, and significantly, the added words are part of defendants' corporate name, further diminishing the degree of its similarity with the Trans Union trade name.

2. Similarity of the Product

The question here is whether Trans Union's and defendants' products and services are related in the minds of the public. Eli Lilly, 233 F.3d at 463 (holding that the products need not be the same, only similar); Brookfield, 174 F.3d 1056-57. Trans Union and defendants are in the business of selling credit information. On their website defendants market credit reports derived from Trans Union's database, as well as individual reports from Equifax and Experian, and merged reports combining information from all three. Thus, a visitor to defendants' website will find that the products offered there are similar, and in some places identical, to those sold by Trans Union. *See* PACCAR, 115 F.Supp.2d at 777-78; Northern Light Technology, Inc. v. Northern Lights Club, 97 F.Supp.2d 96, 111 (D.Mass. 2000), *aff'd*, 236 F.3d 57 (1st Cir. 2001).

### 3. Concurrent Use

This factor requires us to "consider whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." Forum Corp. of North America v. Forum, Ltd., 903 F.2d 434, 442 (7th Cir. 1990). Both parties use the internet to promote, distribute and sell credit reports. The ease with which users can navigate through internet websites makes it "more likely" that consumers will "be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." Brookfield, 174 F.3d at 1057; see Nissan Motor Co., Ltd. v. Nissan Computer Corp., 89 F.Supp.2d 1154, 1164 (C.D. Cal. 2000), aff'd, 2000 WL 1875821 (9th Cir. 2000) This is especially so when the domain name of the allegedly infringing website contains the plaintiff's trade name. See PACCAR, 115 F.Supp.2d at 778. There is no evidence in the record as to how each side goes about advertising their products outside of their websites, and therefore we cannot determine to what extent their promotional campaigns overlap in real space. Their concurrent marketing efforts in cyberspace, however, weigh in favor of Trans Union.

### 4. Degree of Consumer Care

The relevant class of consumers here consists of internet users. This group encompasses the full range of purchasers and therefore is not amenable to any broad generalizations regarding sophistication. See Intermatic Inc. v. Toeppen, 947 F.Supp. 1227, 1235-36 (N.D. Ill. 1996). "[W]hen a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 293 (3rd Cir.), cert. denied, 502 U.S. 939 (1991). Surely, some consumers will know enough about the credit

reporting industry to understand that defendants' use of Trans Union's trademarks does not necessarily mean that Trans Union has endorsed defendants' website. But less knowledgeable consumers may draw different conclusions. Furthermore, purchasers of inexpensive products generally pay less attention to their transactions than do consumers of high-priced goods. *See* Brookfield, 174 F.3d at 1060; Maxim's Ltd. v. Badonsky, 772 F.2d 388, 393 (7th Cir. 1985). The credit reports sold on defendants' website cost approximately $8 (Cplt. Exh. 7). Consumers of such reports are unlikely to exercise a high degree of care when making their purchases over the internet.

### 5. Strength of the Marks

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source." Eli Lilly, 233 F.3d at 464 (quotation and citations omitted). Trans Union's trademarks are invented terms and therefore fall on the arbitrary and fanciful end of the trademark spectrum. *See* Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 727 (7th Cir. 1998). As such, they are distinctive and generally considered strong trademarks. *See* Brookfield, 174 F.3d at 1058; Intermatic, 947 F.Supp. at 1236. Moreover, Trans Union has been using its trade name and logo since the early 1970s and spends millions of dollars annually in advertising and promoting the marks (Emery aff. at ¶ 6). *See* Classified Ventures, L.L.C. v. Softcell Marketing, Inc., 109 F.Supp.2d 898, 900 (N.D. Ill. 2000); Northern Light, 97 F.Supp.2d at 114. Trans Union's trademarks are strong and their strength buttresses its quest for injunctive relief.

### 6. Actual Confusion

There is no evidence in the record of actual confusion on the part of consumers visiting

defendants' website. Of course, at this stage of the litigation the lack of any such evidence is neither surprising nor fatal to Trans Union's motion. *See* Eli Lilly, 233 F.3d at 464-65.

Defendants' website does pose a risk, however, of what is known as initial interest confusion. *See* Eli Lilly, 233 F.3d at 464-65. On the internet, initial interest confusion occurs when customers seeking a particular website are diverted by allegedly infringing domain names and metatags to a competing website, and then "realize that the site they have accessed is not the one they were looking for," but nevertheless "decide to use the offerings of the infringing site." The Network Network v. CBS, Inc., 2000 WL 362016, at *8 (C.D. Cal. Jan. 18, 2000); see Brookfield, 174 F.3d at 1062-65. Internet users looking to buy credit reports from Trans Union may well be drawn to a website bearing the transunioncredit domain name and displaying the Trans Union logo. They may realize upon further investigation that the website actually belongs to defendants. Yet, finding that the competing website also sells credit reports, users may abandon their search for Trans Union's website and purchase credit reports from defendants instead. The risk of such initial interest confusion is less with regard to the creditbureautransunion domain name, which is more distinguishable from Trans Union's trade name. But with regard to the logo and the transunioncredit domain name, the risk of initial interest confusion tips this element of the test in favor of Trans Union.

7. Defendants' Intent

Finally, we examine defendants' intent. Defendants claim that their website's use of the trademarks is meant to reflect their legitimate business affiliation with Trans Union. The display of the logo, however, offends express instructions to the contrary. Trans Union's April 7, 1998 letter to defendants quite clearly states: "Trans Union Corporation does not permit the CRONUS bureaus to make any use of its 'TU' logo" (Cplt. Exh. 5). The registration of

domain names containing Trans Union's trade name also suggests an intent to confuse, especially when one compares the domain names at issue (transunioncredit and creditbureautransunion) with the designations specifically noted as incorrect in Trans Union's 1996 letter to local credit bureaus (*e.g.*, "Trans Union's [city] Bureau" and "[city/state]'s Trans Union bureau") (cplt. exh. 3). See <u>Brookfield,</u> 174 F.3d at 1059 ("In the internet context, ... intentional registration of a domain name knowing that [it] is another company's valuable trademark weighs in favor of likelihood of confusion."); <u>PACCAR,</u> 115 F.Supp.2d at 779 ("Using [plaintiff's trade names] in a domain name sends a message to Internet users that the web site is associated with, or sponsored by the company owning the trademarks"). The evidence in the record regarding defendants' intent mildly favors Trans Union.

D. <u>Summary</u>

The fair use doctrine protects defendants' use of the Trans Union trade name in a website metatag. Thus, we need only assess the confusing nature of the logo and domain names. Balancing the relevant factors, we find that there is a likelihood of confusion with regard to the logo and transunioncredit domain name, but not as to the creditbureautransunion domain name. Trans Union's trademarks are strong, and both Trans Union and defendants market similar products and services on the internet to consumers exercising little care when making their purchases. These four factors weigh in Trans Union's favor. The remaining three factors – similarity of the marks, actual confusion and intent – have a less uniform impact on the analysis. These "most important considerations" (<u>Eli Lilly,</u> 233 F.3d at 462) carry varying degrees of significance based on the type of allegedly infringing use at issue.

As to the Trans Union logo, defendants display an identical copy of it on their website

in a manner that is likely to create at least initial interest confusion among consumers. Moreover, defendants chose to display the logo even though they knew that Trans Union forbid its use by local credit bureaus. Therefore, Trans Union is likely to succeed on the merits of its infringement claim with respect to the logo. Similarly, the transunioncredit domain name closely resembles the Trans Union trade name and poses the threat of initial interest confusion. Defendants registered that domain name in spite of Trans Union's instructions regarding the limited uses of its trade name. Thus, Trans Union is likely to succeed on the merits of its infringement claim with respect to the transunioncredit domain name as well. The second domain name, creditbureautransunion, is less problematic, particularly because it is not as similar to Trans Union's trade name and poses little threat of confusion. *See* TCPIP, 2001 WL 197939, at *14 (enjoining use of some allegedly infringing domain names but allowing defendant to continue using others). Therefore, at this stage of the litigation, Trans Union has not demonstrated much of a likelihood of success on the merits of its infringement claim with respect to the creditbureautransunion domain name.

## III. Trademark Dilution

Trans Union also relies on the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)(1), in support of its motion for preliminary injunction. That statute provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). In order to prove trademark dilution, Trans Union must establish that:

(1) its logo and trade name are famous trademarks; (2) defendants' use began after the marks

had become famous; (3) defendants' use "causes dilution" of the trademarks; and (4) defendants' use is commercial and in commerce. Eli Lilly, 233 F.3d at 466. The fair use defense applies in dilution claims just as it does in infringement claims. TCPIP, 2001 WL 197939, at *14 n.12; see 15 U.S.C. § 1125(c)(4). Therefore, as with our infringement analysis, we restrict our dilution inquiry to defendants's web page display of the logo and domain name use of the trade name.

The parties do not raise any questions regarding the famous nature of Trans Union's trademarks, the junior status of defendants' use of the marks, or the commercial purpose of defendants' website. The only real issue, then, is whether defendants' website dilutes Trans Union's trademarks. Dilution "means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of" competition between the parties or likelihood of confusion among consumers. 15 U.S.C. § 1127. Dilution occurs in cyberspace when defendant's use "lessens the capacity of [plaintiff] to identify and distinguish its goods and services by means of the Internet." Intermatic, 947 F.Supp. at 1240; see Panavision International, L.P. v. Toeppen, 141 F.3d 1316, 1326 (9th Cir. 1998). A showing of actual economic harm is not required to establish dilution in this circuit. Eli Lilly, 233 F.3d at 468. Instead, Trans Union need only demonstrate a likelihood of dilution based on the renown of its trademarks and the similarity between those marks and the allegedly diluting uses of defendants. Id. at 468-69.

Trans Union registered its trademarks in the early 1970s and has been using them ever since. It maintains a high profile, being one of the three largest credit agencies in the country, and spends millions of dollars every year advertising and promoting its logo and trade name (Emery aff. at ¶ 6). This evidence establishes the renown of Trans Union's trademarks, at least

in the credit reporting industry. *See* <u>Syndicate Sales, Inc. v. Hampshire Paper Corp.</u>, 192 F.3d 633, 640-41 (7th Cir. 1999) (discussing niche market fame in dilution case); *see also* <u>Eli Lilly</u>, 233 F.3d at 469. With respect to the similarity issue, defendants are displaying an identical copy of Trans Union's logo on their web pages. This use is likely to diminish the capacity of Trans Union to identify its own website and products using the logo. Defendants' display of the logo, therefore, constitutes dilution. This is also true of defendants' use of the transunioncredit domain name. *See* <u>PACCAR</u>, 115 F.Supp.2d at 779-80 (holding that "kenworthusedtrucks.com" domain name diluted "Kenworth" trade name); *see also* <u>Panavision</u>, 141 F.3d at 1326-27; <u>Intermatic</u>, 947 F.Supp. at 1240. For the same reasons we discussed above in part II.C, however, we find that the domain name creditbureautransunion is not sufficiently similar to Trans Union's trade name and therefore does not amount to dilution.

## IV. <u>Other Preliminary Injunction Factors</u>

Finally, since we have found that Trans Union is likely to succeed on the merits with respect to certain elements of its claims, we must examine the remaining requirements for preliminary injunctive relief. "Irreparable harm is generally presumed in cases of trademark infringement and dilution." <u>Eli Lilly</u>, 233 F.3d at 469. Similarly, "damages occasioned by trademark infringement are by their very nature ... not susceptible of adequate measurement for remedy at law." <u>Processed Plastic Co. v. Warner Communications, Inc.</u>, 675 F.2d 852, 858 (7th Cir. 1982). The balance of harms also favors Trans Union, especially given the limited nature of the injunction issued today. We do not enjoin conduct that is consistent with the terms of the service agreement so defendants will still be able to describe accurately their affiliation with Trans Union, on the internet and elsewhere. We also do not enjoin defendants

from embedding the Trans Union trade name in a website metatag and using the creditbureautransunion domain name. Thus, the harm caused by defendants' infringing conduct on the internet outweighs the relatively modest range of activity banned by our injunction. Lastly, "the public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion." Eli Lilly, 233 F.3d at 469.

## CONCLUSION

For the reasons set forth above, Trans Union's motion for preliminary injunction is granted as follows: 1) defendants shall cease using the Trans Union logo; 2) defendants shall cease using the domain names transunioncredit.com, transunioncredit.net, and transunioncredit.org, and shall not register and/or use any other domain names inconsistent with this order; and 3) defendants shall transfer ownership of the domain names transunioncredit.com, transunioncredit.net, and transunioncredit.org to Trans Union. The remaining elements of Trans Union's motion are denied.

JAMES B. MORAN
Senior Judge, U. S. District Court

March 26, 2001.