Minute Order Form (06/97)

# United States District Court, Northern District of Illinois



| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3885 | **DATE** | 6/1/2001 |
| **CASE TITLE** | Trans union LLC vs. Credit Research Inc. et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Trans Union and Acxiom have moved to dismiss the counterclaims under Fed.R.Civ.P. 12(b)(6) and 9(b). Trans Union's motion is granted in part and denied in part with respect to count 1, and denied as to counts 2, 3 and 4. Acxiom's motion is granted with respect to counts 1 and 4, but denied as to counts 2 and 3.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | |
|---|---|---|---|
| | No notices required. | | number of notices |
| | Notices mailed by judge's staff. | | JUN 04 2001 date docketed |
| | Notified counsel by telephone. | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials |
| | Mail A 450 form. | ED-7 FILED FOR DOCKETING | |
| | Copy to judge/magistrate judge. | 01 JUN -1 PH 2: 52 | date mailed notice |
| WAH | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRANS UNION LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 00 C 3885 |
| | ) |
| CREDIT RESEARCH INC., and | ) |
| CREDIT BUREAU OF CARMEL and | ) |
| PEBBLE BEACH, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| CREDIT RESEARCH, INC. and | ) |
| CREDIT BUREAU OF CARMEL and | ) |
| PEBBLE BEACH, INC., | ) |
| | ) |
| Counter-plaintiffs, | ) |
| vs. | ) |
| | ) |
| TRANS UNION LLC, and ACXIOM | ) |
| CORPORATION, | ) |
| | ) |
| Counter-defendants. | ) |

DOCKETED
JUN 0 4 2001

## MEMORANDUM OPINION AND ORDER

Defendants Credit Research, Inc. and Credit Bureau of Carmel and Pebble Beach, Inc. (collectively Credit Bureaus) have filed four counterclaims against plaintiff Trans Union LLC and counter-defendant Acxiom Corporation. The complaint[1] alleges (1) breach of contract; (2) equitable accounting; (3) conversion; and (4) fraud, against each. Trans Union and Acxiom

---

[1] Because these are motions to dismiss counterclaims, the traditional pleading roles are reversed. Although nominally defendants, Credit Bureaus are plaintiffs with respect to the counterclaims and accordingly receive the benefit of all inferences. See Northern Trust Co. v. Peters, 69 F.3d 123, 129 (7th Cir. 1995). For simplicity, we will refer to the parties by their nominal titles (i.e., Trans Union is the plaintiff), but to the counter-complaint as the complaint, and counterclaims as claims. Trans Union's initial complaint is not at issue here.

have moved to dismiss the counterclaims under Fed.R.Civ.P. 12(b)(6) and 9(b). For the following reasons, Trans Union's motion is granted in part and denied in part with respect to count 1, and denied as to counts 2, 3 and 4. Acxiom's motion is granted with respect to counts 1 and 4, but denied as to counts 2 and 3.

## BACKGROUND

All parties are in the credit reporting business. They collect data on individuals and sell it to customers, such as credit issuers. Permissible use of the data is regulated by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq*. Trans Union is one of three national players in the industry. Credit Bureaus are local agencies, operating in Santa Cruz, San Benito and Monterey counties in California. Acxiom provides similar data services to the financial industry, such as list management and brokerage. Since 1992, Acxiom has managed all of Trans Union's data processing operations. Trans Union is Acxiom's largest shareholder and has the right to appoint two directors on Acxiom's board.

Since 1986, Credit Bureaus have affiliated with Trans Union, their relationship defined by a service agreement which expires in July 2001. They collect data within their service area and license the data to Trans Union for national distribution. According to the contract, Trans Union then pays them a portion of the revenues attributable to their data. The agreement prescribes specific formulae for different uses of the data. Trans Union provides Credit Bureaus with monthly statements showing the number of names from their service area sold, revenue generated and amount owed. Trans Union has similar arrangements with local agencies all across the country. Its database, known as CRONUS, includes a combination of

data licensed from these franchisees and data owned directly by Trans Union.[2]

Trans Union sells data in several forms, including credit reports and prescreened lists. Trans Union pays Credit Bureaus a prescribed fee for each credit report sold on an individual within their service area. The agreement classifies certain Trans Union customers as "key accounts," and Credit Bureaus receive a lower fee for reports sold to these end-users. Trans Union has the exclusive ability to determine whether a customer meets the agreement's criteria for key account pricing. Prescreened lists are used by customers, such as credit card issuers, who wish to make unsolicited firm credit offers to consumers. Trans Union culls a list of consumers who meet the customer's defined criteria from CRONUS. The resulting list is referred to as "names surviving processing." Trans Union then allocates the revenue from selling the list, according to who contributed the data, and pays franchisees, including Credit Bureaus, a portion of the revenue attributable to each. Because only Trans Union knows how many names were processed and which names survived, it has the exclusive ability to allocate the revenue.

Under the contract, defendants were to receive 40 per cent of the prescreened list revenue attributable to their service area. The current dispute involves how the gross revenue figure attributed to each service area is computed. The complaint alleges that the proper formula is: surviving names attributable to Credit Bureaus, divided by total *surviving* names, multiplied by total revenue from the list. It further alleges that Trans Union used the following formula: surviving names attributable to Credit Bureaus, divided by total *processed*

---

[2] The balance between company-owned and independent franchisees has shifted over time. In 1986, 193 of the 225 bureaus affiliated with CRONUS were independent. Today, Trans Union owns all but eight (cplt. ¶62).

names, multiplied by total revenues from the list. The complaint also provides an example which amply demonstrates the significance of this difference:

> Assume that a pool of 1,000,000 names, evenly distributed across the United States, are prescreened for an Empirica credit score of greater than 700, producing a list of 100,000 surviving names that is sold for $.05 per name, or $5,000. Assume that Credit Bureau contributed 10,000 of the 1,000,000 names in the pool (1%), and 1000 of the 100,000 names surviving processing (also 1%). Credit Bureau should receive $20 (i.e. 1,000/100,000 * $5,000 * 40%). But under Trans Union's formula, Credit Bureau would receive only $2 (i.e. 1,000/1,000,000 * $5,000 * 40%).

(cplt. ¶80). In this example, Credit Bureaus receive 10 per cent of the revenue to which they believe they are entitled. This figure will fluctuate, of course, depending on the percentage of total names that survive processing. But the Trans Union formula will always yield a lower number. After reviewing two proposed service agreement amendments incorporating this formula, Credit Bureaus discovered the discrepancy.

## DISCUSSION

When deciding a Rule 12(b)(6) motion we must assume the truth of all well-pleaded factual allegations, making all possible inferences in the non-movant's favor. <u>Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund</u>, 25 F.3d 417, 420 (7th Cir. 1994). We will dismiss a claim only if it appears "beyond doubt that the [complainant] can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). Fed.R.Civ.P. 8(a)(2) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Generally, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." <u>Strauss v. City of Chicago</u>, 760 F.2d 765, 767 (7th Cir. 1985). But the complaint must allege facts sufficiently setting forth the essential elements of each cause of action. <u>Gray v. County of Dane</u>, 854 F.2d 179, 182 (7th Cir.

1988).

I. Trans Union's Motion

### A. Equitable Accounting

Defendants' accounting claim is a logical starting point because it will help develop the facts for the remainder of the case. Credit Bureaus believe Trans Union exploited their data without proper compensation. But the documents tracking what actually happened to their data and how their fees were computed are primarily Trans Union records, to which defendants have no access. An accounting will require Trans Union to document, in detail, all the transactions involving defendants' data. It will reveal how many of defendants' names were used, how many times, in what proportion to the data as a whole and how the fees were computed; this will go a long way towards clarifying whether there were any contractual breaches, false statements or conversion of the data.

To state a claim "the complaint must allege the absence of an adequate remedy at law and one of the following: (1) a breach of fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." People ex rel. Hartigan v. Candy Club, 501 N.E.2d 188, 190 (Ill. App. 1st Dist. 1986). Plaintiff argues that the existence of a breach of contract claim demonstrates an adequate legal remedy and, consequently, precludes any equitable one. We see no reason to prevent defendant from pleading in the alternative. Moreover, contract damages may not fully compensate defendants for the full diminution of their asset's value. Several of the other factors are also present. We have already discussed defendants' need for discovery. The complaint's reliance on information and belief allegations only highlights that most of the

determinative facts will come from records within plaintiff's control. There are also allegations of fraud. Further, the accounts in question will likely prove sufficiently complex. *See* Lorsch v. Gibraltar Mutual Casualty Co., 262 N.E.2d 313 (Ill. App. 1st Dist. 1970). There are multiple types of products. Names are sold and resold. The fact-finder must calculate a separate revenue allocation for every prescreened list plaintiff sold over fifteen years. Credit Bureaus' share of the revenues had changed over time. And prices vary depending on who the end user is. This could well be "beyond the ken of average jurors." At this point we cannot say with certainty that legal remedies will be adequate or that the accounts are insufficiently complex. The allegations are more than adequate to survive a motion to dismiss.

As we discuss below, there are substantial problems with parts of this complaint. A thorough review of the accounts will likely resolve these pleading problems, clarify the disputed facts and ultimately help the court evaluate the merits of the substantive allegations. Accounting discovery is a sensible first step in sorting out what has actually happened between these parties.

### B. Breach of contract

Count 1 alleges that Trans Union breached the service agreement in five distinct ways: plaintiff (1) offered discounted pricing to customers who did not qualify as key accounts; (2) made Credit Bureaus' data available to list brokers, list managers and resellers without payment to defendants; (3) allowed its affiliate Acxiom to improperly use Credit Bureaus' data without compensation; (4) used erroneous formulae in computing payments owed defendants for data included in prescreened lists; and (5) terminated all payments to defendants for use of their data in prescreened lists.

Plaintiff argues that the first three claims are improper because the complaint alleges facts "on information and belief." This is not, as plaintiff contends, fundamentally improper. *See, e.g.,* PS Promotions, Inc. v. Stern, 2001 WL 293033 at *3 (N.D. Ill. Mar. 23, 2001). The reason we generally disfavor this form of pleading is Rule 11's requirement that counsel make a reasonable inquiry before filing a complaint. A party may not indulge in a fishing expedition or file a complaint on a rumor or a hunch. *See* Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 684 (7th Cir. 1992). But the federal rules also recognize that sometimes parties will not have access to all the facts until they have had an opportunity for discovery. In such cases, "information and belief" pleading may be permissible. The complaint must demonstrate both that the information is inaccessible and that the pleader has reasonable grounds to suspect those facts. *Id.*

First, Credit Bureaus have alleged that Trans Union offered key account pricing to customers who did not qualify for that discount under the service agreement. Defendants maintain that without access to Trans Union's records they cannot determine whether specific customers qualified as key accounts. Among other requirements, key account customers must request the discount, have compatible technology for automated inquiries and maintain a specified volume of business with Trans Union (cplt. ¶30). It is unlikely defendants could determine these facts prior to discovery. But defendants have not provided any grounds for their suspicions. The complaint articulates, at great length, a purported scheme by Trans Union to acquire full ownership of its franchisees' data at depressed prices by suppressing cash flows. FCRA disclosure rules prevent plaintiff from understating the number of reports sold. *See* 15 U.S.C. § 1681g. Designating the end user as a key account, however, would allow

Trans Union to reduce the price per report. Because we have no way to verify key account status, the complaint reasons, they must be using that to cheat us. That is nothing more than speculation. The complaint does not provide any factual basis for these suspicions.[3]

Second, the complaint alleges that Trans Union sold lists, including defendants' data, to list brokers, list managers and resellers without compensating Credit Bureaus. Defendants cite facts stated in an FTC opinion as the basis for their belief that Trans Union so used their data (cplt. ¶113). They also allege that Trans Union's agreements with list brokers allow those brokers to use CRONUS data without reporting which names they used to Trans Union or its franchisees. Without such an accounting, there is no way to allocate revenues to the proper franchisees. Defendants found some evidence of this in agreements that list brokers had filed with the SEC (cplt. ¶¶114, 115). Plaintiff again attacks the complaint's wording, pointing out that it only claims the agreements "appear to" be improper. This is enough at the pleading stage. These agreements, on their face, sufficiently justify defendants' suspicions that their data is being misused to survive a motion to dismiss.

Third, defendants allege that Trans Union gave Acxiom improper access to Credit Bureaus' data. Trans Union contracted Acxiom to do its data processing, so Acxiom necessarily had access to the data, including that licensed from defendants. But the complaint cites several Acxiom statements trumpeting the advantages of its affiliation with Trans Union and its resulting access to Trans Union's data. Moreover, Acxiom is engaged in list brokerage and sells products derived from Trans Union's data.[4] If Trans Union permitted Acxiom to use

---

[3] The complaint specifically identifies three customers so designated who purportedly did not qualify (cplt. ¶65). But these allegations are also on information and belief, and with no articulated basis.

[4] Trans Union's database, as we have already discussed, includes data licensed from defendants.

Credit Bureaus' data for its own benefit, and without compensation, that would constitute a breach. Defendants have no way to determine, prior to discovery, if the Trans Union data Acxiom is using includes Credit Bureaus' data, or how Acxiom is using it. Plaintiff derides the complaint's use of the words "specter" and "prospect." But these are formulations of defendants' suspicions. Defendants properly allege the facts of which they are aware, and adequately claim that Acxiom's statements raise suspicion of a breach.

The fifth alleged breach is really two points in the alternative. For many years Trans Union had included Credit Bureaus' data in prescreened lists and paid Credit Bureaus for each usage. Then the payments stopped. Defendants contend that plaintiff is still using their data, without paying for it, or that excluding their data from the lists breaches plaintiff's duty of good faith and fair dealing under the agreement. The former allegation is not properly pled. All the complaint actually alleges is that the payments stopped. The response brief argues "Counter-plaintiffs have no way of knowing whether such data exclusion actually took place, and until TU proves on the merits the Credit Bureau's data actually was excluded, Credit Bureau will continue to claim that TU breached the Service Agreement by terminating such payments" (def. br. at 6). This improperly attempts to shift the burden. It is incumbent upon the pleader to allege a breach. The mere fact that Trans Union has not proven it excluded the data, does not justify an assumption that they are still using it. The complaint neither alleges that Trans Union is still using Credit Bureaus' names, nor states any facts justifying suspicion that they are.

Defendants alternatively argue that Trans Union's reason for excluding their data is to force them to accept less favorable terms, and that this breaches Trans Union's duty of good

faith and fair dealing. But their own arguments belie this position. Both parties agree that the contract permits use of defendants' data in prescreened lists, "subject to their mutual consent" (cplt. ¶31). Defendants in fact argue emphatically that consent is a condition subsequent and that they have the right to withdraw it at any time. They also acknowledge that Trans Union could unilaterally reduce the percentage of prescreened list revenue paid to Credit Bureaus. Their brief ultimately argues that Credit Bureaus' right to withdraw consent was the reason Trans Union applied the new formula secretly rather than openly reducing the rate. Following defendants' own logic, if use was subject to the parties' mutual consent, Trans Union was not obligated to use the data at all. And plaintiff may stop using it at any time. Doing so does not breach the agreement, and does not evince bad faith. *See* <u>Baxter Healthcare Corp. v. O.R. Concepts</u>, Inc., 69 F.3d 785, 792 (7th Cir. 1995).

Trans Union's motion does not address the fourth alleged breach, that it used the wrong formulae in calculating payments owed defendants. The complaint does adequately allege a discrepancy, so this claim may go forward, along with the second and third claims described above.

C. <u>Conversion</u>

To state a claim for conversion the complaint must allege: "(1) unauthorized and wrongful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) a demand for possession." <u>A.T. Kearney, Inc. v. INCA Int'l, Inc.</u>, 477 N.E.2d 1326, 1334 (Ill. App. 1st Dist. 1985). Plaintiff attacks the first, third and fourth elements.

Trans Union was lawfully in possession of Credit Bureaus' data pursuant to the service

agreement. But that contract also constrained Trans Union's use of that data. Defendants still owned it, and improper use of confidential business information can constitute a conversion. *See* Conant v. Karris, 520 N.E.2d 757, 763 (Ill. App. 1st Dist. 1987); FMC Corp. v. Capital Cities/ABC, Inc., 915 F.2d 300, 305 (7th Cir. 1990). The complaint alleges that Trans Union allowed Acxiom to use defendants' data for Acxiom's own benefit. This would exceed the uses permitted under the contract and diminish the data's value, allegedly by several million dollars, to its rightful owners. Permitting a third party to use property that does not belong to you, as if it were your own, is a conversion. As we discussed in the breach of contract analysis, Acxiom's business, its access to Credit Bureaus' data, the products it sells and its own statements sufficiently justify defendants' suspicions for pleading purposes.

As to the third element, the contract only permitted Trans Union to use it "subject to their mutual consent." Credit Bureaus could withdraw their consent at any time and assert their exclusive rights to the data. Defendants retained sufficient rights in the data.

Lastly, although the owner must normally demand its property be returned before filing a conversion claim, Illinois law recognizes an exception to this requirement. If the unauthorized user has already "sold or otherwise disposed of" the property, then a demand would be futile. *See* Monroe Cty Water Coop. v. City of Waterloo, 437 N.E.2d 1237, 1240 (Ill. App. 5th Dist. 1982). The same principle applies in this situation, where defendants claim the damage was already done and irreversible. Once confidential information is disclosed, it is no longer confidential. Acxiom's use of the data may have already diminished its value enough that a demand would not substantially alleviate the rightful owner's loss. The complaint's allegations in this regard are sufficient to survive a motion to dismiss.

### D. Fraud

Count 4 alleges that Trans Union committed fraud by misrepresenting the amount owed Credit Bureaus. Under Illinois law the elements of a fraud claim are:

> (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

Cramer v. Insurance Exchange Agency, 675 N.E.2d 897, 905 (Ill. 1996).[5] Plaintiff moves to dismiss on three grounds: a simple breach of contract cannot be fraud; defendants cannot show reliance; and the complaint fails to plead fraud with particularity, as required by Rule 9(b).

Plaintiff is correct that failure to advertise a breach does not constitute fraud. *See* Hemenway v. Peabody Coal Co., 159 F.3d 255, 261 (7th Cir. 1998). The existence of a contract, however, does not absolve fraudulent behavior. If a party makes false statements in an attempt to conceal a breach, that can be fraud. *See* Mutuelle Generale Francaise Vie v. Life Assurance Co., 688 F.Supp. 386, 393 (N.D. Ill. 1988). Here, defendants allege that Trans Union misrepresented the portion of its revenues attributable to Credit Bureaus' service area, and consequently led defendants to believe they were receiving their correct share of the revenues when in fact they were not. If proven, this could constitute fraud. Because the contract already exists, plaintiff also claims Credit Bureaus cannot show reliance on the purportedly

---

[5] In challenging plaintiff's citation to Cramer, defendants misconstrue the Erie principle. *See* Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). They are correct that federal, not state, pleading standards apply. But Illinois law defines the elements necessary to state a fraud claim. Fed.R.Civ.P. 9(b) may require fewer facts than the parallel Illinois rule, but it requires that the complaint allege all the elements of fraud, here defined by Cramer, with particularity.

false statements. But this contract contained a condition subsequent. Credit Bureaus could withdraw their consent to use of their data at any time. The false statements allegedly caused defendants to not exercise that right. The complaint's charge that Trans Union misrepresented its prescreened list computations to prevent defendants from withdrawing their consent does state a fraud claim. Credit Bureaus also allege that Trans Union used the 40 per cent prescreened list allocation as leverage in negotiating other terms. If plaintiff knowingly used a false figure to persuade defendants to accept other agreements, that too would demonstrate reliance and constitute a fraud.

Fed.R.Civ.P. 9(b) requires the complaint state the circumstances constituting the fraud with particularity. This means "the who, what, when, where and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). It does not require every last detail defendants intend to introduce at trial. Mutuelle Generale, 688 F.Supp. at 393. Particularly where the fraud continued over an extended period, the complaint need not identify every instance of false statements. Id. Here, the complaint focuses on the monthly account reports Trans Union submitted to Credit Bureaus. Each one stated the revenue attributed to Credit Bureaus' service area, and showed the 40 per cent calculation. Defendants maintain that Trans Union intentionally understated the first number, the attributable revenue, by using a formula other than the one outlined in the contract. The complaint identifies who created the reports, what they said, when they were sent, from where they were sent and how the stated number misrepresented the true amount. Several of the documents themselves were appended to the complaint (cplt.exhs. A and B). This is sufficient to state a claim under Rule 9(b). The other statements cited, such as the 1997 and 1999 letters

proposing to amend the service agreement, are not themselves fraudulent. But they do provide evidence of motive and intent, and help explain the mechanics of the purported scheme.

## II. Acxiom's Motion

### A. Equitable Accounting

As we noted in our discussion of the parallel allegations against Trans Union, a breach of fiduciary relationship is only one of several possible bases for this claim. *See* Hartigan, 501 N.E.2d at 190. Counter-defendant was unquestionably in possession of defendants' data. If Acxiom was using that data for its own benefit, Credit Burueas would be entitled to an accounting of any illicit profits. The need for discovery here is identical to the other accounting claim, and the accounts will be equally complex. Again, with respect to adequate legal remedies, defendants may plead in the alternative. Only by allowing this claim to proceed will we be able to determine whether this equitable remedy is appropriate. And the discovery will also develop additional facts necessary to evaluate the merits of the other claims.

### B. Piercing the Veil

Acxiom had no direct relationship with Credit Bureaus. As such, the breach of contract and fraud claims do not allege specific wrongdoing by Acxiom itself. Instead, defendants rely on the close relationship between the two companies and attempt to hold Acxiom liable for Trans Union's actions. Defendant argues that Trans Union and Acxiom are so closely intertwined that they are essentially one company, each fully liable for the other's actions. Acxiom correctly characterizes this as an attempt to pierce the corporate veil,[6] which is

---

[6] This is slightly unorthodox in that defendants are attempting to recover from a subsidiary for the parent's wrongs, rather than the other way around. Because defendants have not sufficiently pled that the companies are indeed alter egos, we express no opinion as to whether such a reverse-piercing is tenable.

governed by the law of the state where the companies are incorporated. *See* <u>Retzler v. Pratt & Whitney Co.</u>, 723 N.E.2d 345, 354 (Ill. App. 1st Dist. 1999). In this case, both Acxiom and Trans Union are Delaware corporations.[7]

Courts are generally reluctant to ignore the corporate form, and so place a high burden on a party asking us to do so. *See* <u>Harco Nat'l Ins. Co. v. Green Farms, Inc.</u>, 1989 WL 110537 at *4, 15 Del. J. Corp. L. 1030, 1038 (Del. Ch. 1989). The alter ego theory is premised on the idea that the corporate entity in question is really a sham, controlled exclusively for the benefit of another, such as a parent company or dominant shareholder. To determine this, courts consider

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

<u>United States v. Golden Acres, Inc.</u>, 702 F. Supp. 1097, 1104 (D. Del. 1988), *quoted in* <u>Harco Nat'l</u>, 1989 WL 110537 at *4. No single factor is essential, but some combination is required, and "an overall element of injustice or unfairness must always be present, as well." *Id.*

The complaint is completely silent about these factors. Defendants make conclusory allegations that Acxiom is an alter ego of Trans Union. All they state in support, however, is that Trans Union is Acxiom's largest shareholder[8] and placed two members on its board of directors. This is not enough. "The separate existences of parent and subsidiary will not be

---

[7] Trans Union is technically a limited liability company, not a corporation, but the corporate form is still defined by Delaware law.

[8] The complaint does not even allege that Trans Union has a controlling share, just the largest one.

set aside merely on a showing of common management of the two entities, nor on a showing that the parent owned all the stock of the subsidiary." Mabon, Nugent & Co. v. Texas American Energy Corp., 1990 WL 44267 at *5, 16 Del. J. Corp. L. 829, 838 (Del. Ch. 1990). The complaint alleges nothing about corporate formalities, capitalization, solvency or how there was any facade. Even at the motion to dismiss stage, the complaint must state something in support of its veil-piercing theory beyond conclusions. Credit Bureaus' complaint does not.

There is also no injustice to be prevented here. This is not a case of a deep pocket hiding behind a judgment-proof sham entity. The parent itself is the alleged perpetrator. Credit Bureaus have adequate recourse against Trans Union directly – at least they have not pled otherwise. We will not pierce the veil here. Acxiom is only liable for its own actions, not Trans Union's. Acxiom had no contract with defendants, so it could not breach one. Acxiom made no statements to defendants, so it could not have defrauded them.

C. Conversion

This claim alleges direct wrongdoing on Acxiom's part. Defendants charge that counter-defendant gained access to Credit Unions' confidential business information from Trans Union, used it for Acxiom's own benefit and thereby diminished the information's value to its rightful owner. For the same reasons discussed regarding the conversion claim against Trans Union, the complaint adequately states a conversion claim against Acxiom.

## CONCLUSION

For the foregoing reasons, Acxiom's motion to dismiss is granted with respect to counts 1 and 4, but denied as to counts 2 and 3. Trans Union's motion to dismiss is granted with respect to the first and fifth parts of count 1, the breach of contract claim. It is denied

as to the second, third and fourth parts of the breach of contract claim, and as to counts 2, 3 and 4.

/s/ James B. Moran
JAMES B. MORAN
Senior Judge, U. S. District Court

June 1, 2001.